Okay, next case before the board, Cioffi v. Google, case number 151194, appeal from the Eastern District of Texas. All right, Mr. Benesek, you want also five minutes for Ruttle? Yes, ma'am. Okay. You saw how well that went before. We'll see if we can get to it. Okay, you may begin. May it please the Court, Your Honor. Eric Benesek on behalf of Appellants Alfonso Cioffi and the estate of Alan Rossman. The first thing I'd like to do is go straight to the District Court's claim construction order. It is at A18 of the appendix, because I want to get out right away what we think is an acceptable construction of the term web browser process. And what's shown at A18 is the Court's announced definition that a web browser process is a process that can access data on websites. Can you speak up a little? Sure. So what's shown there is the Court's definition that a process, a web browser process is a process that can access data on websites. That definition, as a practical matter, is acceptable to us. What does access data mean, though? Because I think, as I read the record in this case, what I come away from is that there's a certain disconnect among the parties as to what accessing means. The notion that I think the District Court was trying to capture by the counsel to the claim construction, if you will, is saying that it has to be capable of actually going out and grabbing the information from the web, is different from what I understand you to be saying when you use the term access. Can you help me with that? You understand the question? I do understand the question, Your Honor. And how we view access is in the context of Mr. Chiaffi's invention, and then also in the context of the NARIN reference, which was cited as the basis for rejecting the claims initially. And access, the reason the examiner raised NARIN as an initial rejection was because Chiaffi's first browser process could not, it wasn't stated whether it could access data on websites. And so when you compare that to NARIN, NARIN had the secure process that is very explicit in NARIN that can never be exposed to website data. It's closed. All website data, download and execution is carried out by the unsecure process. And so the secure process is maintained. What we told the examiner was that, fine, it's not explicit. We will add the additional requirement. We will spell out in the claims that the first browser process must be capable of accessing website data. But when you use the term access, and when you use the term web browser for that matter in the patent, you do not mean a process that goes out and plucks data from the web. You're, at least with respect to one of your two browsers, you're saying, as I understand it, that it accesses data on websites if it sits at home and receives data that a different browser actually goes and plucks off the web. And that first browser, the second browser, then takes that data and transfers it to the first browser, the one that does not actually go onto the web. That's your position, right? I'm using lay terms. The problem is that these terms like access tend to be somewhat amorphous, and I'm struggling to see exactly what you're saying the difference is between NARIN and, let's say, the accused device here. Well, I think that the best place to look is how we use the term access in claims. And I think the best example of that is claims 36 through 39 of the 529 patents. It's cited in our papers. It's at A147, and what the claims say there for, let's take the independent claim of 36. It says verbatim that the first browser process and the second browser process must be capable of accessing website content. It's stated right there in the claims. When you take a step down and you look at the very next claim, the next dependent claim, what does it say? It says the first browser process must have direct access to the network interface. So now the claim is calling out what we mean by direct access. What we mean by direct access is direct access to the network and not through the second browser process. You go to the very next claim, Your Honor, you go to claim 38. I take it that the reason this is important is that the allegedly infringing device doesn't have direct access. Correct. The second browser process, the device does not have direct access, only indirect access. Only indirect access. And so your point, as I understand it, is that at least some of your independent claims you believe would cover all indirect access. Absolutely. Cover both, but not require both. Right. Because you have dependent claims that require direct access. Absolutely, Your Honor. That is exactly our point and our argument as to the direct and the indirect. So what did you do, what was the effect of adding the term web to the reference to the browser? I'm glad you asked. I always wonder if that's actually a candid statement. No, it's something I've given a lot of thought to. Because it is where all the action is, right? I mean, this is all about prosecution history disclaimer, what were the disclaiming statements, what was the amendment that represents the disclaimer, right? And first you go to what are the disclaiming statements, and then what was the subsequent amendment in response to those statements? The subsequent amendment was the term web, okay? So what does web mean? We have a very simple explanation for why web was added. When you go to Google's brief, the entire prosecution history disclaimer argument is on page 32 of their brief, and they cite to one statement by the examiner as the disclaimer, okay? Well, that statement is at 703 and 704 of the prosecution history. It's two paragraphs, it's paragraphs 6 and 7. You read those two paragraphs, and you will see what the examiner says is, he says, hey, your first web browser process discloses in the specification three possible embodiments. It discloses a web browser process embodiment, a video game embodiment, and a word processor embodiment. And I read Naren to at least meet the latter two, the video game and the word processor. So why do the applicants add web? Quite simply to say, fine, word processor's out, video game's out. We're going to narrow it to the disclosed embodiment of web browser process in the specification. That's all that term means, Your Honor. That's the simplest and most plausible explanation for the ad. How they want you to read the addition of web is web equals surrender of indirect access. And that takes three steps to get there. You've got to back up a little bit and say, so how did that become surrender? First, let me summarize there. What was the relationship between adding the word web and the Naren? Right. So let me summarize. Exactly. So let me tie that. To summarize Google's disclaimer argument, the first part of their argument is this. Naren discloses an indirect access embodiment. But you have to start with that assumption. Step two, the examiner's statements I just referenced. The examiner says, hey, your claims have these three embodiments. What the examiner is really saying is, hey, Naren discloses this indirect embodiment. You need to amend your claims in response to that indirect embodiment. Google's third argument, the applicant added the term web to respond directly to the examiner's statement that you need to amend because of this supposed indirect embodiment. It's wrong on all three steps. It's wrong at the very beginning because Naren does not allow indirect access. It's just not allowed by the reference. The first process is secure and will never be permitted. What's the date of Naren? Oh, it's 2000 or 2001, Your Honor. It predates by a couple years. So just look at Naren right at the beginning. Naren does not have an indirect disclosure. So that's the first problem with their argument. The second problem is the examiner's statement. As I just said, the examiner doesn't say anything about Naren's indirect embodiment, and that's why you have to amend your claims. And then you finally get to the actual amendment of web. Our point is there is no connection. What is it in Naren that was cured by the addition of the word web? Nothing in Naren was cured by the addition of web. Naren was cured when we added the language to the first browser process that says the first browser process shall have the capability of accessing website content, website data. That was added in direct response to the examiner's rejection under Naren. Because in Naren, Video Game couldn't access website data. Precisely, or web browser or word processor, precisely. So there's just no connection between the examiner's stated rejection and the subsequent amendment that added the term web. And Naren didn't require us to surrender indirect access because Naren didn't contain indirect access. So backing up, I mean we're talking all about prosecution history, but there are three steps here to claims instruction. There's looking at the claims, which I already talked about. There's looking at the specification, which I think you can go to figure one as any of these certain patents. You will see very clearly in figure one all the bidirectional errors between the first process and the second process. Both processes can access directly and indirectly. That's probably the best place to see what we're talking about, how a first process can go directly to the Internet or it can go indirectly through the other process. You're into your rebuttal. Do you want to say that? Thank you, Your Honor. I'll say the rest of the rebuttal. Good morning. May it please the Court. Stephanie Scaff on behalf of Apelli Google Inc. I'm going to start directly with the question Judge Bryson asked about access. And what the appellant has told the Court is that one place to look is these three claims, 36 through 39, and that there is a claim differentiation argument that makes clear this distinction between direct and indirect access. I would submit to this Court that the issue of direct and indirect is really a red herring here. The District Court did not find and did not distribute these claims to require direct access. In fact, the District Court specifically said it wasn't going to use that word. And there's a reason for that. Well, what the District Court said is that you don't have to have direct access, but you have to be capable of direct access. So that was, for your purposes, that was just as good as requiring direct access. Let me clarify the distinction I'm making. If you look at these claims, what claims 36 through 39 are talking about are the first web browser process and the second web browser process being configured to access website content via the network. That's the independent claim. And then the dependent claims talk about being configured to directly exchange data with a network interface device. So the concern, and if you look at the underlying transcript, the back and forth of the Court, the concern was if you use the word direct, you're really implying no intervening hardware structure. This original invention, the original 247 patent, was really a hardware invention. It morphed over time to these reissued patents, which are software-based processes. But there are still hardware pieces within the specification. And the concern is you use direct, and you might be thinking you couldn't have a network interface device in between, you couldn't have an amplifier, a multiplexer, something else, some other component in between. So let's not use the word direct. Let's talk about the functionality itself. What does a web browser process, how does the process have to function? And that's the construction that the Court gave. So the Court gave a construction to web browser process that gave meaning to the functionality. And that's what's before this Court. What is the meaning of the addition of the word web to the existing browser process language? Web gave the meaning that is clear from the prosecution history. This is an unusual case. Web browser process does not appear anywhere in the specification. It is a term that was coined as part of the prosecution. So that's where we look. This is not a disavowal or disclaimer analysis. This is a claim construction. It's straightforward claim construction analysis. We're looking at what is the content of the intrinsic record with respect to web browser process. But if you go through all of the back and forth with the examiner, I mean, I think your friend on the other side is well supported in his comment that you take a few words out of context and don't give us the whole history. But the whole history of the back and forth shows that there was no concern about direct or indirect access. And certainly, as of then, there was not even an issue that a video game or a word processor could access the net. And so the point was whether or not you can differentiate NARIN solely on the basis that there was some form of accessibility. Right. So I think that's exactly right. I think the accessibility issue is what's at issue. In other words, do you access the internet? And if you look at what the examiner said in paragraph 5, throughout his arguments, the applicant makes reference that the first browser process is a web process. And then the examiner goes on. It is noted that the features upon which the applicant relies, that the claimed browsers are actually web browsers, and so this is referring to both the first and the second browser, not just the first, are not resided in the rejected claim. And then later on, the examiner goes on to express a concern about the video games. But why is there a concern about the video games? Because the video games are described within the specification as interactive programs that render content. And that's what the secure application in NARIN did. And in fact, that's what the renderer in the accused device does. So the question is, what makes that different? And I would point the court to a couple of places within the discussion by the applicants themselves and their arguments, including on page 858 of the record, where the applicant argues that the secure application uses a non-secure software object to perform an action or provide a service that is not directly implemented within application 312. And this is the paragraph where it goes forward and describes the example where application 312, this is in NARIN, may provide some type of web browsing capability to its user, but how does it do that? This is what it says. But rather than performing the actual web browsing functions itself, application 312 may call upon a general purpose browsing program to perform the web browsing. So what it's saying is... I'm sorry, where exactly on 258 are you reading that? 258, this is the first paragraph on 258. Oh, I see, the top paragraph. So basically, the description of NARIN is very similar to what we see in the accused device. And this is the basis for understanding what a web browsing process is. What does the web browsing process do in NARIN? Why do you add the web browsing process language? The press argued when you asked the question, what does web do? They said, well, it just eliminates the video and the word processing program. That's what it does. But what's the content of that? Can I just pause for a second? Because what you just read from is marked as confidential in the brief, and so I haven't heard of a waiver of confidentiality with respect to this. I mean, it's marked as confidential in the appendix. Is there a reason that... I'm not sure. I think this may just be highlighted. Yeah, this is the... The appendix is not marked as confidential. Okay, okay. This is part of the prosecution's history. This is the appellate's argument to the examiner. Yeah, it's highlighted here, which normally means confidential. Oh, I see, yes. This is highlighted. Somebody's highlighted it. Yeah. Neither hard to read. Right. You know, I could go on and point the court to further areas in this argument that do similar... that provide similar kind of recitation of this difference in the RIN. This is the focus of the argument. The focus of the argument is that the browsing program and not the secure rendering application is what is doing the accessing the retrieval of the web pages. That is the distinction that the argument... Okay, but so why does that have to be done directly? Well, because that's exactly what they're distinguishing in NIRIN. In other words, NIRIN, it's not directly implemented within the secure application. Well, but in NIRIN, they're not saying it's not directly implemented. They're just saying in NIRIN, it can't do it at all. In other words, its application can't do it at all. There may be some other way that it can eventually get something, but it's not a question of it doing it. It's actually silent on that point is what it is, and the language that's used is actually that exact language directly implemented. So it's not directly implemented is what it says at the top of A258. I think it's incorrect for the appellant to assert that NIRIN doesn't allow for some type of... It's just silent on that point, and that's not the distinction that the applicant made to the office at all. There's no discussion of a pass-through, anything like that. But you're asking us to find a clear disclaimer here. No. Actually, we're just asking you to do a straightforward claim construction analysis. What does the intrinsic record say about the term web browser processing? The only place where that term comes up is in the prosecution's history. It doesn't exist in the specification. It wasn't part of the original invention. I mean, this is a unique case because we're here on a claim construction for four reissued patents that came out of an original patent that looked very, very different. That issue, whether the difference is significant from a legal standpoint, wasn't yet before the court because claim construction came first. But that's the job of this court today is to do the claim construction in light of whatever intrinsic evidence exists with respect to the term. Let me circle back to the question that I think I started with your opposing counsel on. In your view, can something be a web browser if it has access to data that is obtained from the web, even though the alleged browser itself doesn't actually have – I'm trying to avoid using the word direct – even though it does not perform the task of downloading the material from the web? No. That's your whole case, right? The access is really – you open up the TCP socket, right? You access the web. That's what you're doing when you're doing the web browser. And you can do that with different hardware components, right? You send the packets in different ways. Maybe you do it directly through a network access device. Maybe you go through several other hardware components. But the software component, the opening up of the TCP socket, is the accessing part, the content of the code of the process. It has to be there to do web browsing. If you don't do that, you're not browsing the web. You're not accessing data on the Internet. I take it your general, your fundamental position is there is no meaning to web browser generally that we're talking about. You're talking about the specific content of this particular insertion in the context of the prosecution history with no specification or written description to help us.  This term, web browser process, there's no evidence in the record at all that this was a web browser. And it's not translatable to any other context, according to you. It's simply the way it turned out in this case. Is that what you're saying? The content for the term in this case is based really on the limited, intrinsic record that is in the prosecution history. Do you want to say anything about, or is the issue still with us, on what a critical file is? I'm happy to address that. The critical file dispute is really a little bit more straightforward, I think. I think both sides have agreed, and there's no dispute, that it is indefinite if it includes critical user files. So the question is whether it should have been construed to you to include critical user files as well as critical system files. And I think what the district court found is that the term critical user files was used multiple times in both the specification and the prosecution history, that those were not just passing references. In fact, they were references to the actual object of the invention, one of the objects being to protect critical user files, and that under those circumstances that this was a subjective term without a standard set forth for measuring the scope of it. But your expert equated critical file with system files and critical systems files. Why isn't that the answer? Well, I think... You're stuck with that. What is your explanation for that that's consistent with your theory of this case? I think what that testimony was is that if you looked without reference to the specification, in other words, if you were just saying what would you initially think of something called a critical file, an expert might think a critical file was a system file. They might think of it as that more limited way. But clearly within the specification, the inventors defined it in a broader way. And they defined it because of the purpose of their invention, they defined it to include critical user files. Because remember, the purpose of this invention was a malware protection invention. They wanted to protect certain things from malware. One of the things you want to protect is things that are critical to the user. But unfortunately, that's a subjective determination and there's no standard given in the specification for how you would decide that. Okay. Okay, anything else? I've got nothing else. All right. Rebuttal? Thank you, Your Honor. Quickly to Judge Klager's questions about there's nothing in the specification about what a web browser process may be. And therefore, we're trying to construe it out of thin air and going straight to the prosecution history. I would direct you to column 17 of the 529 patent, which is at A145 of the appendix. And if you start at line 10 and go down to roughly line 25, what you have there is a discussion of what a logical process is. 145 of the appendix, what line? 145 of the appendix, column 17, starting at line 10. Okay. What's described there, Your Honors, is what is a logical process. Well, what's described there as a logical process is simply a set of instructions for executing various functions of any number of programs. And then in this section, it refers to different types of programs with processing programs, web browser programs, operating systems. So the point is that a logical process is a set of instructions that can carry out various functions. When the applicants were required to amend, and we went through this whole discussion about, you know, they started with the term browser process, yet the examiner was saying, well, your browser process appears broader in this specification. It appears to be word processing programs. Well, you add web to the logical process. All they are doing there is saying, fine, it's not every logical process. It's a web browser process, but it's still a set of instructions for executing functions of a web browser program. Now, I think it's just, Preston, you were asking the question about whether each process needs to do everything. I would direct you to claims 1 through 20 of the 528 patent, because those claims show the two processes working together to render a common display. And the point there is that when the web browser processes are working together, the idea is that they don't need to do everything. They need to do, both of them need to do everything in order to render the common display. And what's key is just look at the claims. The claims say what each process has to do. The first process has to be capable of opening the second process. The first process has to be capable of accessing the web. The first process has to be capable of reading and writing into the first memory space and the second memory space. The second web browser process has to be capable of rendering the website data. It has to be capable of communicating with the first browser process. But it needs not be capable, indeed should not be capable of accessing the web. It need not be capable of accessing the web directly. It needs to be capable of accessing the web one way or another. But it need not be capable of doing it directly. But listen, when you say accessing the web, in the context that we have here, with respect to the second browser, web browser process, you're really saying just receive data from the first web browser, right? No, no, I'm saying... What is it doing that constitutes web browsing if all it's doing is getting data from the first web browser? You're talking about the indirect embodiment. Yes. So the indirect embodiment, all the indirect embodiment requires is that the web browser process has some reliance on the other process in terms of receiving the website data. The whole key is... So anything in the entire instrument that receives data that originated from the web is a web browser? No, no. What is it that makes the second web browser in the indirect mode a web browser that doesn't make the printer a web browser? It's a great question because it's carrying out the function of a web browsing program, which includes rendering the website data, which includes passing data to the first browser process, which in certain bodies includes gaining direct access to the data itself. So in the claims, the browser process, whether it's the first or the second, has very specific requirements. It's not in the abstract here that you have to read web browser process in the context of the claims as a whole. And when you do that, you see there are very specific requirements for both. It's not just a web browser process can be anything as long as it receives website data. But this goes back to Judge Bryson's opening debate about what do you mean by access. The second browser in indirect mode doesn't have access, does it? It absolutely has access. It is being provided the data... It cannot independently go onto the web. Without assistance, it cannot independently go onto the web and download. It is relying on the other process to at least download that data so it can be executed in the second process. So it only has access to the first? In the indirect embodiment, yes. And not to the web? In the indirect embodiment. It does have access, but only through the first. Okay. We're with you. Okay, thank you. The case will be submitted.